**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 30, 2001**

THE PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant/
    Cross-Appellee,

v                                 No.  117390

MICHAEL ROBERT CUSTER,

    Defendant-Appellee/
    Cross-Appellant.

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

After arresting defendant's companion for possessing marijuana, a police officer conducted a patdown search of defendant. The officer removed what he believed to be blotter acid from defendant's pocket and placed it on the roof of the vehicle. When the officer finished searching defendant, he

retrieved the object from the roof of the vehicle and observed what appeared to be three photographs facing down. He turned them over to examine the fronts of them. The photographs depicted defendant's companion posed in a house containing large quantities of marijuana. The police went to defendant's house and observed furnishings similar to those in the photographs. They obtained a search warrant for defendant's house and seized marijuana therein.

Defendant was charged with several drug-related offenses. The district court dismissed the charges on the ground that the patdown search of defendant had been illegal. The circuit court affirmed the district court's decision. The Court of Appeals affirmed the circuit court's decision on the ground that, even though the patdown search of defendant had been legal, the police officer should not have turned the photographs over to examine the fronts of them. We granted leave to consider whether it was proper for the police officer to: (1) briefly detain defendant, (2) patdown defendant, (3) seize the photographs from defendant, and (4) turn the photographs over to examine the fronts of them. We conclude that it was. Accordingly, we would affirm the decision of the Court of Appeals that the brief detention of defendant, the patdown search of defendant, and the initial seizure of the photographs from defendant were proper, and we would reverse

2

the decision of the Court of Appeals that the police officer's turning over and examining the photographs was improper.

I. FACTS AND PROCEDURAL HISTORY

Two police officers were dispatched to a residence in Bay City to investigate a possible trespass. When they arrived at the location, the officers observed a parked vehicle occupied by Billy Holder and defendant. One of the officers approached Holder, the driver of the vehicle, and asked him to get out of the vehicle. Because the officer believed that Holder was intoxicated, the officer advised Holder that he could not drive, and thus his vehicle would have to be towed at his own expense. When the officer asked Holder to demonstrate that he had enough money to pay for the towing, Holder removed approximately $500, mostly in ten and twenty dollar bills, from his pants pocket, along with a plastic baggie that contained marijuana. The officer arrested Holder and placed him in the patrol car. Once Holder was placed in the patrol car, Holder yelled to defendant, "don't tell them a f——thing." The officer then asked defendant to step out of the vehicle, and conducted a patdown search of defendant. At this point, the officer anticipated finding weapons and drugs on defendant. During the patdown, the officer felt what he believed to be a two-by-three-inch card of blotter acid in defendant's front pants pocket. The officer's belief was

3

based on his knowledge that blotter acid is often contained on sheets of cardboard. The object was actually three Polaroid photographs that showed Holder posed with large quantities of marijuana in the living room of defendant's house. The officer removed the photographs from defendant's pocket and placed them on the roof of Holder's vehicle face down. It was only after finishing the patdown of defendant moments later, that the officer picked the photographs up and turned them over to examine their fronts.

After the photographs were seized from defendant by the police, a Bay City detective contacted a Mount Pleasant detective and provided him with three addresses, including defendant's address, to determine if any of the houses contained furnishings similar to those found in the photographs. The Mount Pleasant detective peered into defendant's house through the front window using a flashlight. His observation of furnishings similar to those in the photographs was used to obtain a search warrant for defendant's house, from which marijuana was seized.

Defendant was charged with delivery and manufacture of 5 to 45 kilograms of marijuana, MCL 333.7401(2)(d)(ii), maintaining a drug house, MCL 333.7405(d), and conspiring to deliver 5 to 45 kilograms of marijuana, MCL 750.157a. The district court suppressed the photographs taken from defendant

4

and the evidence obtained from the search warrant executed at defendant's home on the basis that the patdown search of defendant had been illegal. As a result of such suppression, the district court dismissed the charges against defendant. The circuit court then affirmed the decision of the district court, and the Court of Appeals affirmed the decision of the circuit court. 242 Mich App 59; 618 NW2d 75 (2000). However, the Court of Appeals concluded that the patdown search of defendant had been legal, but that the officer should not have turned the photographs over to look at their fronts. Additionally, the circuit court found the search of defendant's home to be improper, but the Court of Appeals never reached that issue.[1] This Court granted the prosecutor's application for leave to appeal and defendant's application for leave to cross-appeal. 463 Mich 907 (2000).

## II. STANDARD OF REVIEW

This Court reviews a trial court's factual findings in a suppression hearing for clear error. *People v Stevens (After Remand)*, 460 Mich 626, 631; 597 NW2d 53 (2000); *People v Burrell*, 417 Mich 439, 448; 339 NW2d 403 (1983). However, "[a]pplication of constitutional standards by the trial court

---

[1] We do not address whether the search of defendant's home was proper because that issue is not properly before us. We remand this matter to the Court of Appeals for their consideration.

5

is not entitled to the same deference as factual findings."

*People v Nelson*, 443 Mich 626, 631, n 7; 505 NW2d 266 (1993).

The application of the exclusionary rule to a violation of the

Fourth Amendment is a question of law. *Stevens, supra* at 631.

Questions of law relevant to the suppression issue are

reviewed de novo. *Id.; People v Sierb*, 456 Mich 519, 522; 581

NW2d 219 (1998).

### III. ANALYSIS

### A. DETENTION

The first issue is whether the initial detention of

defendant was invalid under the Fourth Amendment of the United

States Constitution and Const 1963, art 1, § 11, which

guarantee the right of persons to be secure against

unreasonable searches and seizures. US Const, Am IV; Const

1963, art 1, § 11.[2] "[A] police officer may in appropriate

---

[2] Michigan's constitutional prohibition against unreasonable searches and seizures "is to be construed to provide the same protection as that secured by the Fourth Amendment [of the federal constitution], absent, 'compelling reason' to impose a different interpretation." *People v Collins*, 438 Mich 8, 25; 475 NW2d 684 (1991). However, if the item seized is a "narcotic drug . . . seized by a peace officer outside the curtilage of any dwelling house in this state," Michigan's constitutional prohibition against unreasonable searches and seizures is not applicable. Const 1963, art 1, § 11. Since marijuana is considered a narcotic drug for purposes of art 1, § 11, if the marijuana had been seized outside the curtilage of a dwelling house, Michigan's constitutional prohibition against unreasonable searches and seizures would not be applicable, although the Fourth Amendment's would be. *Michigan v Long*, 463 US 1032, 1044, n 10; 103 S Ct 3469; 77 L Ed 2d 1201 (1983). However, in the

6

circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v Ohio*, 392 US 1, 22; 88 S Ct 1868; 20 L Ed 2d 889 (1968). A brief, on-the-scene detention of an individual is not a violation of the Fourth Amendment as long as the officer can articulate a reasonable suspicion for the detention. *Michigan v Summers*, 452 US 692, 699-700; 101 S Ct 2587; 69 L Ed 2d 340 (1981); *People v Shabaz*, 424 Mich 42, 56-57; 378 NW2d 451 (1985). "Police officers may make a valid investigatory stop if they possess 'reasonable suspicion' that crime is afoot." *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996).

In this case, the police were dispatched to a residence to investigate a complaint regarding a possible trespass. When they arrived at the scene, they found Holder and defendant in a parked vehicle, and very briefly questioned them about their presence in the area. They determined that Holder, the driver of the vehicle, was too intoxicated to be driving. Therefore, they began to make arrangements for Holder's car to be towed so that defendant and others on the road would not be jeopardized. While making these

---

present case, the marijuana was found in the curtilage of defendant's dwelling house, and thus both the Fourth Amendment's and Michigan's constitutional prohibition against unreasonable searches and seizures are applicable.

arrangements, Holder (presumably inadvertently) pulled a baggie of marijuana out of his pocket, and was arrested. Immediately after this arrest, the police conducted a patdown search of defendant.

In summary, before the marijuana was found, the police, upon a complaint of criminal conduct, properly detained defendant in a public place, for the purpose of determining whether a crime had been committed. See *Shabaz*, *supra* at 56. Further, after the marijuana was found, the police properly detained defendant for the purpose of conducting a limited search for weapons on the basis of reasonable suspicion. See *Champion*, *supra* at 99. Therefore, we conclude that the brief detention of defendant in this case was valid under the Fourth Amendment of the United States Constitution and Const 1963, art 1, § 11.

### B.   PATDOWN SEARCH

The next issue is whether the patdown search of defendant was invalid under the Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution. US Const, Am IV; Const 1963, art 1, § 11.  A police officer may perform a limited patdown search for weapons if the officer has a reasonable suspicion that the individual is armed, and thus poses a danger to the officer or to other persons.  *Terry*, *supra* at 27; *Champion*, *supra* at 99.  "The

8

officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, *supra* at 27. "Reasonable suspicion entails something more than an inchoate or unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *Champion*, *supra* at 98. In order to demonstrate reasonable suspicion, an officer must have "specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, *supra* at 21.

It is the totality of the circumstances in a given case that determine whether a patdown search is constitutional. *Champion*, *supra* at 112. In this case, defendant was a passenger in a vehicle in which criminal activity was discovered. The driver of the vehicle, Holder, was found with a large amount of cash in small denominations and a baggie of marijuana, which led the officer to believe that Holder was selling drugs. The officer was told that defendant and Holder had been together all evening. After Holder was arrested and placed in the patrol car, he yelled to defendant not to tell the police anything. The officer testified that, because of his twenty-three years of experience and training as an officer, he knew that when drugs are involved, weapons are

9

also often involved.  Therefore, the basis for his decision to conduct a patdown search of defendant was that defendant might be in the possession of a weapon, thereby posing a threat to himself or his partner.  Under the totality of the circumstances before us, we find that the police had reasonable suspicion to warrant a patdown search of defendant.[3]

Furthermore, the fact that the officer did not fear for his safety before the marijuana was found does not change our conclusion that the patdown search of defendant was proper. The relevant inquiry when determining whether the police have properly conducted a patdown search is "whether the officer's action was justified at its inception . . . ." *Terry*, *supra* at 20.  Therefore, the fact that the officer did not fear for his safety before the marijuana was found is irrelevant; what is relevant is that, after it was found, the officer was concerned for his safety, and this was when the officer conducted the patdown search of defendant.  Additionally, the

---

[3] We agree with the dissent that "defendant could not be stopped and frisked merely on the basis that he was associated with Holder.  Rather, the circumstances had to indicate that the defendant himself was articulably and reasonably suspected of criminal wrongdoing, and suspected of being armed and dangerous."  *Post* at 11.  We further agree with the dissent that the fact that defendant was associated with Holder, *along with the other circumstances in this case*, *did* indicate that defendant himself was, articulably and reasonably, suspected of being armed.  Thus, the police officers were justified in conducting a patdown search of defendant.

10

fact that the officer anticipated finding drugs on defendant as a result of this search does not change our conclusion that the patdown search of defendant was proper. The United States Supreme Court has held that

> evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer. The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by . . . a valid exception to the warrant requirement. [*Horton v California*, 496 US 128, 138; 110 S Ct 2301; 110 L Ed 2d 112 (1990).]

The proper focus is on the *actions* of the officer, not his *thoughts*. In the present case, it is irrelevant that the officer was secondarily looking for drugs because the principal purpose of the patdown search of defendant was to ensure that he did not have any weapons. Accordingly, we find that the objective facts that prompted the officer to determine that his safety, and that of his partner, might be at risk, were sufficient to warrant the patdown search of defendant. Therefore, we conclude that the patdown search of defendant was valid under the Fourth Amendment of the United States Constitution and Const 1963, art 1, § 11.

C.  SEIZURE OF THE PHOTOGRAPHS

The third issue is whether the seizure of the photographs from defendant during the patdown search of defendant was

11

invalid under the Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution. US Const, Am IV; Const 1963, art 1, § 11. This Court has previously held:

> The plain feel exception to the warrant requirement adopted by the United States Supreme Court in *Minnesota v Dickerson*, . . . allows the seizure without a warrant of an object felt during a legitimate patdown search for weapons when the *identity of the object is immediately apparent and the officer has probable cause to believe that the object is contraband.* [*Champion*, *supra* at 100-101 (emphasis in the original).]

In conducting a patdown search, an officer may seize items that the officer has probable cause to believe are contraband from the plain feel. "[A]n object felt during an authorized patdown search may be seized without a warrant if the item's incriminating character is immediately apparent . . . ." *Id.* at 105. Patdown searches are designed to discover weapons or other instruments that might injure an officer. However, when conducting a patdown search, police officers may also seize noncontraband objects that they have probable cause to believe feels like contraband. *Minnesota v Dickerson*, 508 US 366, 373; 113 S Ct 2130; 124 L Ed 2d 334 (1993); *Champion*, *supra* at 105-106.

In this case, while conducting the patdown search of defendant, the officer felt a two-by-three-inch object in defendant's pocket that he believed was a card of blotter

12

acid. His belief was based on his knowledge that blotter acid was often contained on sheets of cardboard; his awareness that cards of blotter acid were capable of fitting into a pants pocket like that he felt on defendant; the antecedent discovery of marijuana and a large amount of money on Holder, the driver of the vehicle in which defendant was a passenger; Holder's shout to defendant not to tell the police anything; the fact that defendant was with Holder during the entire evening; and the officer's training and twenty-three years of experience as a police officer. Under these circumstances, the officer had probable cause to believe that the object he felt in defendant's pocket was contraband. Accordingly, the officer was justified in removing the photographs from defendant's pocket pursuant to the plain feel exception to the warrant requirement.

Furthermore, it is irrelevant that what was ultimately retrieved from defendant's pocket was not, in fact, blotter acid. What is relevant is that the officer had probable cause to believe that the photographs were blotter acid from his plain feel. The probable cause requirement does not demand "that a police officer 'know' that certain items are contraband . . . ." *Texas v Brown*, 460 US 730, 741; 103 S Ct 1535; 75 L Ed2d 502 (1983). Rather, "probable cause is a flexible, common-sense standard. It merely requires that the

facts available to the officer would 'warrant a man of reasonable caution in the belief,' *Carroll v United States*, 267 US 132, 162; 45 S Ct 280; 69 L Ed 543 (1925), that certain items may be contraband . . . ; it does not demand any showing that such a belief be correct or more likely true than false." *Id.* at 742. Once an officer has probable cause to believe that an object is contraband, he may lawfully seize the object. *Champion*, *supra* at 105. The fact that the officer is ultimately wrong in his assessment of the object does not render the seizure unlawful. As discussed above, the officer had probable cause to believe that the photographs were blotter acid, and thus he lawfully seized them from defendant, regardless of the fact that they subsequently proved instead to be photographs. Therefore, we conclude that the seizure of the photographs from defendant was valid under the Fourth Amendment of the United States Constitution and Const 1963, art 1, § 11.

### D. SEARCH OF THE PHOTOGRAPHS

The final issue is whether the turning over and examining of the fronts of the photographs that were validly seized was invalid under the Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution. US Const, Am IV; Const 1963, art 1, § 11. A search for Fourth Amendment purposes occurs only when "an expectation of privacy

14

that society is prepared to consider reasonable is infringed." *United States v Jacobsen*, 466 US 109, 113; 104 S Ct 1652; 80 L Ed 2d 85 (1984). "If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Warrant Clause." *Illinois v Andreas*, 463 US 765, 771; 103 S Ct 3319; 77 L Ed 2d 1003 (1983). If a person has no reasonable expectation of privacy in an object, a search of that object for purposes of the Fourth Amendment cannot occur. *Dickerson*, *supra* at 375; *People v Brooks*, 405 Mich 225, 242; 274 NW2d 430 (1979).

In this case, when the officer turned the lawfully seized photographs over to examine their fronts, this was not a constitutional "search" for purposes of the Fourth Amendment. *At this point*, defendant's reasonable expectation of privacy in the outer surfaces of the photographs had already been significantly diminished, at least sufficiently to justify the officer's turning over and looking at the photographs.[4] The

---

[4] By a reasonable expectation of privacy being "significantly diminished," we describe a situation in which an object, once lawfully seized, is subject at least to *some* type of manipulation. However, it does not mean that the object is subject to *any* type of manipulation. Once an object has been validly seized, an individual's reasonable expectation of privacy is not necessarily lost altogether, allowing the police to manipulate the object *any* way they see fit; rather, one's reasonable expectation of privacy is merely diminished, allowing the police to manipulate the object *only* in a manner consistent with the individual's remaining reasonable expectation of privacy. A permissible manipulation may well be different for different types of objects and for

photographs were already lawfully seized by the officer. Once an object is lawfully seized, a cursory examination of the exterior of that object, like that which occurred here, is not, in our judgment, a constitutional "search" for purposes of the Fourth Amendment.[5] See *Arizona v Hicks*, 480 US 321, 325-326; 107 S Ct 1149; 94 L Ed 2d 347 (1987). This is true because a cursory examination of the exterior of an object that has already been lawfully seized by the police will produce no *additional* invasion of the individual's privacy interest.[6] "It would be absurd to say that an object could be

---

different circumstances. The dissent asserts that "[i]f an individual has a diminished expectation of privacy, as opposed to no expectation of privacy, then necessarily he must have some expectation of privacy in the place to be searched." *Post* at 35. We agree. However, in this case, the officer's turning over and viewing the other side of the photographs did not, in our judgment, offend defendant's remaining reasonable expectation of privacy.

[5] We conclude that once an object has been lawfully seized, the police may move the object and look at its outer surface or exterior. However, we do not address whether the police may manipulate an object in any other sort of way, i.e., open an object, once it has been lawfully seized because that question is not before us. Such a search is not implicated by this case.

[6] We use the terms "outer surfaces" and "exterior" to mean essentially the same thing, i.e., the outside of an object. We use the phrase "outer surfaces" when referring to the photographs because photographs do not typically have an exterior and an interior. We use the term "exterior" when referring to objects in general to make the point that our holding addresses whether the police can look at the exterior of an object, not whether, under different circumstances, they can look at their interior.

16

seized and taken from the premises, but could not be moved for closer examination." *Id.* at 326. Once the police have lawfully seized an item from a person, that person's reasonable expectation of privacy in the exterior of that item has, at the least, been significantly diminished.[7] "Once an item has been seized in connection with a lawful search . . . any expectation of privacy by a person claiming ownership is significantly reduced. *MacLaird v Wyoming*, 718 P2d 41, 44 (Wy, 1986). For example, in *United States v Bonfiglio*, 713 F2d 932, 937 (CA 2, 1983), the Court held that the police, who had lawfully seized a tape cassette, were not required to obtain a search warrant before playing the cassette because, once it had been lawfully seized, defendant no longer had a reasonable expectation of privacy in the recorded statement. Similarly, in this case, the police, who had lawfully seized three photographs, were not required to obtain a search warrant before turning the photographs over to examine their outer surfaces because, once they had been lawfully seized, defendant's reasonable expectation of privacy in these

---

[7] We conclude that once the police lawfully seized the photographs, defendant's reasonable expectation of privacy in the outer surfaces of those photographs was, at the least, significantly reduced. However, we do not address whether one has a reasonable expectation of privacy in items inside a container, i.e., purse, wallet, or luggage, once the police have lawfully seized the container because, again, that question is not before us.

17

surfaces had been significantly diminished, at least enough to justify the cursory examination that occurred here.

Again, we emphasize that the turning over of the photographs occurred only after the police had already lawfully seized them from defendant. The reason that the police, in this case, were allowed to turn the photographs over was because they already had valid possession of them. In *Hicks*, *supra* at 326, the United States Supreme Court held that the police could not move stereo equipment to see the serial numbers on it because the police lacked probable cause to believe it was contraband *before* they moved it. However, in this case, the Court of Appeals correctly determined that the photographs had already been lawfully seized by the police. Where *Hicks* involved a preseizure movement or action by the police, the present case involves a postseizure movement or action. The police cannot manipulate an object in order to determine whether it is contraband; it must be immediately apparent from plain view or plain feel that the object is contraband. *Id*. In the present case, the police did not move the object to examine it more closely in order to determine whether it was, in fact, contraband; rather, the police already had probable cause to believe that it was contraband upon plain feel, and only after the object was validly seized did they move the object to examine it more

18

carefully. Because the officer had already lawfully seized the photographs when he turned them over to examine their fronts, and because defendant's reasonable expectation of privacy in the outer surfaces of those photographs had, at the least, been significantly diminished, there was no constitutional "search" for purposes of the Fourth Amendment.

As discussed above, it is irrelevant that the officer originally suspected that the seized object was blotter acid when it was actually photographs. What is again relevant is that the officer had probable cause to believe that the object was contraband from plain feel, and thus he lawfully seized it. Once the object was lawfully seized, the officer could look at its outer surfaces without obtaining a warrant. See *Hicks*, *supra* at 325-326. In *Brooks*, *supra* at 250-251, this Court held that it was not a search for Fourth Amendment purposes when the police more carefully examined a noncontraband item that was seized from the defendant and that the police by then lawfully possessed. Once the police lawfully have possession of an object, there is no need for the police to obtain a search warrant to look at or scrutinize the exterior of that object. *People v Rivard*, 59 Mich App 530, 533-534; 230 NW2d 6 (1975). This is true because once the police lawfully take possession of an object, one's expectation of privacy with respect to that object has "at

19

least partially dissipated . . . ." *Id*. For these reasons, we conclude that the exterior of an item that is validly seized during a patdown search may be examined without a search warrant, even if the officer subsequently learns that the item is not the contraband the officer initially thought that it was before the seizure.

In this case, the Court of Appeals correctly determined that the police officer had lawfully seized the photographs and that the officer had lawfully placed the photographs face down on the roof of the vehicle. However, the Court of Appeals held that the officer should not have turned the photographs over to examine their fronts. Apparently, the Court of Appeals decision would have been different if the photographs had been placed on the car face up, rather than face down, because then the officer would not have had to turn the photographs over to see their face; instead, they would have been in plain view. We cannot agree with that kind of logic. The law should not turn on the serendipity of which side of the photographs were facing up when the officer removed them from defendant's pocket. Rather, the law turns on whether the officer's actions violated any of defendant's constitutional rights. We do not believe that they did. Regardless of which side of the photographs came out facing up or down, the officer could look at all the sides of the

photographs without violating any of defendant's constitutional rights. Therefore, we conclude that the turning over and examining of the other side of the photographs by the police, under the circumstances of this case, did not deprive defendant of his constitutional rights under the Fourth Amendment of United States Constitution or Const 1963, art 1, § 11.

## IV. RESPONSE TO THE DISSENT

The dissent agrees with our conclusion that the brief detention of defendant was proper and that the patdown search of defendant was proper. However, it disagrees with our conclusion that the seizure of the photographs from defendant was proper and that the officer's turning over and examining of the photographs was proper.

### A. SEIZURE OF THE PHOTOGRAPHS

The dissent concludes that the seizure of the photographs from defendant was improper. We, of course, disagree. The dissent contends that "[i]n *Champion*, the majority *extended* the United States Supreme Court decision in *Dickerson* to encompass plain feel seizures of items that *might* contain contraband." *Post* at 21 (emphasis added). First, this Court did not *extend* anything in *Champion*; rather, it merely adopted

21

the plain feel exception as articulated by *Dickerson*.[8] Second, *Champion* did *not* conclude that under the plain feel exception the police may seize objects that *might* be contraband. Rather, *Champion, supra* at 105-106, concluded, as did *Dickerson*, that under the plain feel exception the police may seize an object from an individual *only* if they "develop[] probable cause to believe that the item felt is contraband . . . ."

The dissent asserts that the fact that the officer thought that the object was blotter acid before he seized it when, in fact, the object was actually photographs is "certainly relevant to our determination whether probable cause existed." *Post* at 23. However, even assuming that it is relevant, it is certainly not dispositive. The United States Supreme Court has said "probable cause . . . does not demand any showing that such a belief be correct." *Brown*,

---

[8] The dissent asserts that *Champion* did extend *Dickerson* because "the very type of additional search prohibited by *Dickerson* occurred in *Champion*" as evidenced by the fact that "before the officer in *Champion* could determine a pill bottle could be classified as contraband, he had to determine somehow that it was in fact used for an illegal purpose." *Post* at 27, n 11. However, in our judgment, no such "additional search" occurred in *Champion*. Rather, the officer had probable cause to believe that the pill bottle was contraband without having to move, squeeze, or otherwise manipulate the pill bottle. Contrary to the dissent, the officer did not have "to determine somehow that it was in fact used for an illegal purpose"; rather the officer merely had to have probable cause to believe that it was contraband.

*supra* at 742. Accordingly, in order to demonstrate probable cause, it is not necessary to show that the officer *knew* that the object was contraband before he seized it. Rather, it is *only* necessary, as was done in this case, to show that a reasonably cautious person in the circumstances would have been warranted in the belief that the object was contraband. *Brown, supra* at 742.

The dissent next asserts that the officer "would have had to manipulate the object in order to determine that it was in fact contraband." *Post* at 27. However, the officer did not move, squeeze, or otherwise manipulate the contents of defendant's pocket in order to determine that the object was contraband. Rather, the officer merely patted down defendant and, when his hand came upon the object, he had probable cause to believe that this object was contraband, and thus he lawfully seized it from defendant's pocket.

The dissent further contends that we rely on the same factors to conclude that there was probable cause to believe that the object was contraband as we do to conclude that there was reasonable suspicion to believe that defendant was armed. Even if this were correct, we question its relevancy. We, of course, recognize that probable cause requires a higher level of justification than does reasonable suspicion. However, it is hardly improper to rely on the same factors to justify

23

each. This is true because reasonable suspicion is merely a lower threshold of justification than probable cause. If, therefore, an officer has probable cause, he necessarily also has reasonable suspicion. Although it is then possible to rely on the same factors to justify each, we do not do so in this case. Rather, there are two relevant factors that support our finding of probable cause that do not support our finding of reasonable suspicion, i.e., the officer's knowledge that blotter acid is often contained on sheets of cardboard and his knowledge that such cards of blotter acid could fit into a pocket like that of defendant's.

### B. SEARCH OF THE PHOTOGRAPHS

The dissent concludes that, even assuming that the police lawfully seized the photographs from defendant's pocket, the officer's turning over and examining of the photographs was improper. We again disagree.

The dissent contends that *Champion* "did not allow a subsequent search merely because the item had been seized. Rather, it *required* the additional justification that the search occur incident to arrest." *Post* at 21, n 7 (emphasis added). First, the *Champion* Court did not *require* the additional justification; it merely concluded that, under the facts, which included a search incident to arrest, the search was lawful. Second, and more importantly, the search in

24

*Champion* involved the *opening* of a container, whereas in this case, the police merely turned photographs over and viewed their other side.  We merely hold that, once an object has been lawfully seized, the police may shift the object and look at its *exterior*; we do *not* address here whether the police may *open* an object and look at its *interior*.[9]

The dissent next contends that "once the officer removed the photographs from the defendant's pocket, it became clear that the object removed was not in fact cardboard . . . [t]hus, . . . the police no longer had justification for infringing upon the defendant's right to possess private photographs."[10]  *Post* at 30-31.  However, given that the officer had already lawfully removed the photographs from

_____

[9] The dissent asserts that "[t]he majority seems to argue that the result might be different were the officer required to open a container and look inside.  Yet, how can this be true considering that the majority places primary reliance on *Champion*, a case in which the officer did just that?"  *Post* at 32, n 16.  The dissent answers its own question: *Champion* "did not allow a subsequent search merely because the item had been seized.  Rather, it required the additional justification that the search occur incident to arrest."  *Post* at 21, n 7.

[10] Contrary to the dissent's assertion, we do not, by failing to reference certain language contained in the dissent, *post* at 31, n 14, fail to appreciate "that a search or seizure without a warrant is circumscribed by the warrant exception justifying it."  Rather, we conclude that no "search" occurred for purposes of the Fourth Amendment where the officer merely turned the lawfully seized photographs over and viewed their other side, and thus no "search" without a warrant occurred, requiring the application of a warrant exception.

defendant's pocket, the additional action on the part of the police officers in turning them over did not constitute an invasion of the defendant's privacy.

The dissent asserts that "[u]nder the majority view, an individual's expectation of privacy in a personal possession would *evaporate* at the moment an officer removes the item from the individual's control, even when the officer's belief is wrong." *Post* at 32 (emphasis added). This is not an accurate statement of our holding. First, we make it quite clear that we do *not* conclude that, once the police lawfully seize an object from an individual, that individual's reasonable expectation of privacy in that object is *altogether* lost. Instead, we merely conclude that defendant's reasonable expectation of privacy in the outer surfaces of the photographs had been *diminished*, at least sufficiently to justify the officer's merely turning over and looking at the other side of the photographs.[11]   Second, we do not even

_____

[11] The dissent asks "[w]hen would a legitimate expectation of privacy preclude a further search under the majority's rationale?" *Post* at 32, n 16.  The answer is that it would *always* preclude a further search.  However, a further search would not necessarily be precluded where there is a warrant or an applicable exception to the warrant requirement.  If an officer *improperly* seizes an object from an individual's pocket, that individual would have a legitimate expectation of privacy that would preclude any further "search" of that object.  If, on the other hand, an officer *properly* seizes an object from an individual's pocket, that individual would also have a legitimate expectation of privacy, but, under the specific circumstances of the instant case, such expectation

26

conclude that one's reasonable expectation of privacy is diminished *whenever* an officer removes an object from one's control, as the dissent implies.  Rather, we conclude that one's reasonable expectation of privacy is diminished only when an officer *lawfully* seizes an object from an individual.  In order for an officer to *lawfully* seize an object from an individual, he must satisfy certain constitutional safeguards.  *Only* after these safeguards have been satisfied can a police officer lawfully seize an object from an individual and view its exterior.

The dissent further asserts that "the majority effectively creates an exception to the warrant requirement that permits a search incident to seizure."  *Post* at 34.  However, our opinion in no way, permits a Fourth Amendment "search" incident to seizure.  Instead, we conclude that there was no "search" in this case when the police turned the photographs over to examine their other side because, in order for there to be a "search," one must have a reasonable expectation of privacy in the object being "searched."  In this case, the police had already lawfully seized the

_____

would not arise until some time after the officer had merely turned over the photographs to view their other side.  As we have already made clear, we are not addressing whether the police may manipulate a lawfully seized object in some manner beyond what has specifically occurred here because that question is not before us.

photographs, and, therefore, defendant's reasonable expectation of privacy in the photographs already had been significantly diminished, at least sufficiently to justify the officer's cursory examination of the other side of the photographs.[12]

CONCLUSION

We conclude that the brief detention of defendant, the patdown search of defendant, the seizure of the photographs from defendant, and the examination of the photographs were each proper. First, because the officer had reasonable suspicion that criminal activity was afoot, the brief detention of defendant was proper. Second, because the officer had reasonable suspicion that defendant might be armed, and thus pose a danger to him and to other persons, the patdown search of defendant was proper. Third, because the officer had probable cause to believe that the object he felt in defendant's pocket was contraband, the seizure of the photographs from defendant was proper under the plain feel exception to the warrant requirement. Finally, because

---

[12] The dissent of Justice Young presents in more undiluted form the argument that the turning over of the photographs to view their other side constituted a Fourth Amendment violation. For the reasons set forth in this opinion, we do not believe that the constitutional underpinnings of the officer's conduct here rest upon whether the lawfully seized photographs were seized facing up or facing down, or adjusted from one position to the other.

28

defendant's reasonable expectation of privacy in the outer surfaces of the lawfully seized photographs had, at the least, been significantly diminished, no "search" for purposes of the Fourth Amendment took place when the officer turned the photographs over and examined their other side. Accordingly, we would reverse the Court of Appeals decision that the officer's turning over and examining of the photographs was improper. We would remand this case to the Court of Appeals for a determination whether the subsequent search of defendant's home was proper.

CORRIGAN, C.J., and TAYLOR, J., concurred with MARKMAN, J.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

THE PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant/
    Cross-Appellee,

v                                                                No.  117390

MICHAEL ROBERT CUSTER,

    Defendant-Appellee/
    Cross-Appellant.

_____

WEAVER, J. (*concurring*).

I concur in the result of the majority opinion.  I write separately to emphasize that the dissenting opinions are inconsistent with the reasoning in *Arizona v Hicks,* 480 US 321; 107 S Ct 1149; 94 L Ed 2d 347 (1987), and this Court's opinion in *People v Champion*, 452 Mich 92; 549 NW2d 849 (1996).  If one believes that the initial seizure of the photographs was valid under the plain feel exception, then the subsequent examination of those photographs was also valid. *Hicks, supra* at 326; *Champion, supra* at 105-106, 117. However, I caution that if *Champion* is construed too broadly, it would be appropriate to revisit the proper limits of that decision in the future.

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant/
    Cross-Appellee,

v                              No. 117390

MICHAEL ROBERT CUSTER,

    Defendant-Appellee/
    Cross-Appellant.

_____

YOUNG, J. (*dissenting*).

I agree with Justice Cavanagh that Officer Greenleaf's actions in examining the photographs he removed from defendant's pocket did not meet Fourth Amendment requirements. Accordingly, I respectfully dissent.

As Justice Cavanagh explains in his dissent, *ante* at 31, "once the officer removed the photographs from the defendant's pocket, it became clear that the object removed was not in fact cardboard. At that moment, the justification supporting the seizure, that the object was immediately identifiable as contraband, no longer existed." In my view, under the Supreme Court's decision in *Arizona v Hicks*, 480 US 321; 107 S Ct 1149; 94 L Ed 2d 347 (1987), any continued examination of the

photographs, however cursory, required additional justification that simply is not present here.

Because I believe that the trial court properly suppressed the photographs as well as the evidence obtained during the subsequent search of defendant's residence, I would affirm the decision of the Court of Appeals.

S T A T E   O F   M I C H I G A N

SUPREME COURT


PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant/
    Cross-Appellee,

v                                           No. 117390

MICHAEL ROBERT CUSTER,

    Defendant.

_____

CAVANAGH, J. (*dissenting*).

    I cannot join in the majority's decision to chip away at the protections afforded by the Fourth Amendment of our United States Constitution. In this case, the probable cause supporting the defendant's ultimate arrest stemmed from the officer's decision to remove and inspect photographs that the defendant was carrying in his front pocket. I cannot support the majority's conclusion that the photographs were validly seized and inspected. I am unconvinced that the requirements of the Fourth Amendment were satisfied.[1] Therefore, I

---

[1] The question before us has not been directly addressed by our state courts. The closest case to being on point is *People v Champion*, 452 Mich 92; 549 NW2d 849 (1996). However, *Champion* did not involve the type of postseizure search that occurred in this case. To the extent that our state constitution is involved, it provides rights coextensive with

**(continued...)**

respectfully dissent.

                                I

In this case, the defendant was ultimately charged with three drug-related offenses. The evidence linking the defendant to the crimes was discovered only after a series of searches and seizures. This appeal involves examination of several of the incidents occurring between the time the defendant was initially detained and the time that he was charged.

The majority adequately discusses the key facts of the case. In brief, the majority correctly points out that (1) the police initially came into contact with the defendant while investigating a trespass violation, (2) the patdown of the defendant occurred only after a baggie of marijuana and wad of money were found on his counterpart, (3) the officer testified that he removed photographs from the defendant's pocket on suspicion that they were blotter acid, (4) the officer first placed the photographs face down on the roof of the car and later flipped them over and examined them, (5) the photographs were later used to obtain a search warrant, and

---

[1](...continued)
the federal constitution and need not be addressed independently from our resolution of the Fourth Amendment issues presented. Thus, this case hinges on the applicability of Fourth Amendment jurisprudence, and United States Supreme Court precedent.

(6) the fruits of the search made pursuant to the warrant formed the basis for arresting and charging the defendant.

Next, the majority adequately identifies the issues presented on appeal. We are faced with determining whether the defendant's constitutional right to be free from unreasonable searches and seizures was violated when: (1) the defendant was stopped by the officers, (2) the defendant was frisked, (3) the defendant's photographs were removed from his front pocket, or (4) the officer flipped the photographs over and examined them.[2] This case involves a series of searches and seizures subject to Fourth Amendment scrutiny. First the defendant was stopped for the purpose of investigating possible criminal activity. Next, the defendant was frisked under the auspices of protecting the investigating police officer. Third, an item was seized from the defendant's front pocket. Fourth, the item seized was searched. Fifth, the defendant was detained and taken to the police station. Sixth, the defendant's home was searched. Seventh, marijuana was seized from the defendant's home. Thereafter, the

_____

[2] The defendant also raises the additional Fourth Amendment questions. The majority concludes that we need not address the defendant's issues. Likewise, this opinion will not address the defendant's additional issues because I would grant relief to the defendant even without reaching the question.

3

defendant was charged with the offenses forming the basis of the instant trial.

It is crucial at the outset to understand the basic premises guiding search and seizure law because Fourth Amendment jurisprudence provides that a criminal defendant has a claim for the suppression of evidence that has been gathered in violation of his Fourth Amendment rights. *Wong Sun v United States*, 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963).

First, it is important to understand that searches and seizures may raise distinct concerns. A "search" for Fourth Amendment purposes hinges on a person's privacy interest. The touchstone test for examining a search is whether a person has a legitimate expectation of privacy in the place to be searched. *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967). A seizure, on the other hand, deprives the individual of dominion over his person or property. *United States v Jacobsen,* 466 US 109; 104 S Ct 1652; 80 L Ed 2d 85 (1984)*; Horton v California*, 496 US 128; 110 S Ct 2301; 110 L Ed 2d 112 (1990). A seizure occurs when some meaningful governmental interference with an individual's possessory interest in property has occurred. *Jacobsen, supra*. In the context of an investigatory stop, a seizure occurs when an officer, by means of force or authority, restricts a person's

4

liberty of movement. *Terry v Ohio,* 392 US 1, 27; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

The United States Supreme Court has made it clear that searches without warrants are unreasonable per se, subject to a few "specifically established and well-delineated exceptions." *Katz* at 357. Similarly, the Court has stated that seizures must be circumscribed "in area and duration by the terms of the warrant or valid exception to the warrant requirement." *Horton* at 139. In the context of searches that result in the seizure of an item suspected to be contraband, the United States Supreme Court has recognized that a government agent's exercise of dominion and control over the item may be a "reasonable" seizure for Fourth Amendment purposes when the effect seized cannot be supported by a reasonable expectation of privacy, and when the agent can show that he had probable cause to believe that the effect contained contraband. *Jacobsen, supra*. Otherwise, the search will be constitutionally unreasonable.

In this case, the people place reliance on two doctrines that sometimes provide justification for searches and seizures without warrants. The first of these doctrines, the "stop and frisk" doctrine, pertains to the ability of law enforcement officials to institute investigatory stops and conduct weapons

5

patdowns.  The second doctrine, the "plain feel" doctrine, relates to an officer's ability to seize items detected through tactile perception during a patdown without a warrant when the officer perceives the items to be contraband.  Each of these doctrines will be discussed.

## A. The Stop and Frisk Doctrine

### 1. Guiding Legal Principles

The "stop and frisk doctrine" has roots in the United States Supreme Court decision in *Terry v Ohio*, which held that a reasonable investigatory stop of criminal defendants is permissible when an officer "observes unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot . . . ."  *Id.* at 30.  Further, the officer may conduct a "patdown" search for weapons when the "officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others . . . ."  *Id.* at 24.

In the event of a *Terry* stop, courts should take into account the whole picture, and determine whether the stop was reasonable under the totality of the circumstances. *United States v Cortez*, 449 US 411, 418; 101 S Ct 690; 66 L Ed 2d 621 (1981).  Under the totality of the circumstances, a stop will

6

be considered valid only when the detaining officer can reasonably articulate a particularized and objective basis for suspecting that the individual stopped had been engaged in or was about to engage in criminal activity. *Terry, supra* at 27. A hunch unsupported by particularized suspicion will not justify the seizure of a person. *Id.*

When the seizure of a defendant does not comport with *Terry*, it will be deemed unreasonable and the evidence flowing from the seizure may be suppressed as fruit of the poisonous tree. *Wong Sun*; *Shabaz, supra*. Pursuant to *Wong Sun*, "the fruits of the officers' illegal action are not to be admitted as evidence unless an intervening independent act of free will purges the primary taint of the unlawful invasion." *People v Shabaz* 424 Mich 42, 66; 378 NW2d 451 (1985).

### 2. Application to the facts

In the present case, the defendant was stopped and frisked on the following grounds: he and Holder were spotted in the area where a trespass violation had been reported, the individuals were detained because Holder was too intoxicated to drive away, Holder was found to be in possession of marijuana, and there was a clear relationship between Holder and the defendant. The detaining officer testified that his twenty-three years of experience taught him that persons in

7

possession of drugs also frequently possess weapons. As such, the officer felt that the defendant might pose a safety threat to himself or to his partner.

The majority opines that, under the totality of the circumstances, the detaining officer was reasonably suspicious of the defendant because the defendant was initially detained for questioning in an area where a suspected trespass had been reported. Similarly, the majority concludes that the defendant was reasonably detained after the officers found marijuana and money on the defendant's companion, Holder.

a. The initial detention of the defendant

I agree with the majority that the police did not violate the defendant's Fourth Amendment rights by approaching the automobile he shared with Holder. The constitution permits law enforcement officers to approach an individual in a public place for the purpose of asking him if he is willing to answer some questions. *Shabaz, supra* at 56, relying on *Florida v Royer,* 460 US 491; 103 S Ct 1319; 75 L Ed 2d 229 (1983) (opinion of White, J.). Where there is no involuntary detention of a defendant, there is no Fourth Amendment seizure within the meaning of the Fourth Amendment. *Id*. In his brief, the defendant acknowledges that the police did not question or approach him until after they found marijuana on

8

Holder.  Thus, I would not find a violation of the defendant's rights stemming from the officers' decision to approach and question Holder while the defendant was a passenger in his car.

b. The continued detention of the defendant after marijuana was found on Holder

The majority next presents the question whether the defendant was further properly stopped after marijuana was found on Holder.  After Holder was searched and detained, the police asked the defendant to step out of the vehicle.  At that point, he was clearly detained.  The officers testified that the defendant was asked to get out of the car so that a patdown search for drugs and weapons could be conducted.  Thus, once the officers asked the defendant to leave the car so that he could be searched, their inquiry moved beyond the realm of merely stopping a person to inquire whether the person is willing to answer questions and into the realm of searches and seizures subject to the constraints of *Terry*.

An officer may initiate an investigatory stop pursuant to *Terry* when he can articulate a reasonable basis for suspecting that the particular individual detained has committed, or is about to commit, a crime.  Further, an officer may conduct a "frisk," a form of limited weapons search, when he has reason

9

to believe that the person suspected of a crime is presently armed and dangerous. However, the officer's ability to investigate the circumstances of a crime on the basis of reasonable suspicion are limited. Full blown searches and seizures must be based on probable cause. *Dickerson, supra* at 378.

According to the majority, "after the marijuana was found, the police properly detained defendant for the purpose of conducting a limited search for weapons on the basis of reasonable suspicion." Slip op at 8. In the majority's view, there was suspicion because the defendant was the passenger in a vehicle in which criminal activity was discovered, drugs were found on Holder, the officer was told that Holder and the defendant had been together all evening, and Holder yelled to the defendant not to say anything. Thus, under the totality of the circumstances and in light of the fact that the officer testified that experience taught him that people with drugs often have weapons, the majority finds the requisite level of reasonable suspicion for a patdown.

Ultimately, I agree with the majority's conclusion that the patdown in this case is sustainable under *Terry*. Thus, I join the majority's holding that the stop and frisk were constitutionally permissible. However, because I believe that

10

the majority jumps too readily from an officer's ability to make investigative inquiries to his ability to stop and frisk, I feel compelled to offer a somewhat more extended analysis than that offered by the majority. The majority bolsters its finding of reasonable suspicion primarily by pointing out that the defendant was and had been in the company of Holder, that Holder was in possession of marijuana, that Holder yelled to the defendant upon being arrested, and that the detaining officer testified that weapons often accompany drugs. Yet, the majority fails to clarify that the defendant could not be stopped and frisked merely on the basis that he was associated with Holder. Rather, the circumstances had to indicate that the defendant himself was articulably and reasonably suspected of criminal wrongdoing, and suspected of being armed and dangerous.

In *Ybarra v Illinois*, 444 US 85; 100 S Ct 338; 62 L Ed 2d 238 (1979), the United States Supreme Court specifically rejected an argument that a person may be stopped and frisked simply for being in an area where drugs are found. There, the police had a warrant to search a bar and bartender for heroin. Ybarra was one of the patrons in the bar when the police arrived to perform the search. They conducted a protective patdown of Ybarra and the other patrons in the bar. In the

11

process, the police seized a cigarette pack from Ybarra and found packets of heroin inside. The Court held that the evidence was subject to suppression on the grounds that the police lacked reasonable suspicion to conduct a patdown search of Ybarra simply because he was in an area where a drug search was occurring pursuant to a warrant.[3]

In the instant case, the defendant was patted down on the basis of the officer's testimony that his experience taught him that people who have drugs often also have weapons. When the defendant was patted down, the police knew that Holder was in possession of an illegal substance, not that the defendant was in possession of an illegal substance.[4] The majority's analysis comes dangerously close to doing exactly what *Ybarra* prohibits-allowing a frisk of a person simply because that person is in propinquity with another reasonably suspected of

---

[3] This Court has also recognized that a defendant will not be considered individually suspicious simply because he is in a high crime area or in an area where drugs are known to be. *Shabaz, supra.*

[4] In fact, the officer testified that part of the purpose of the frisk was to search for weapons on the defendant. The majority finds the officer's motivation to be irrelevant; however, the law makes it clear that a search exceeding *Terry* must be based on probable cause. Thus, to the degree that the officer's knowledge relates to the extent of the search and to his belief that the defendant possessed drugs, it is plainly relevant.

engaging in criminal activity.

While I agree that the police officers were justified in conducting a patdown under the specific facts of this case, I believe that we must take great care not to cross the threshold established in *Ybarra*. It cannot be summarily concluded that the defendant himself could reasonably be suspected of engaging in criminal wrongdoing simply because of his association with Holder. In order to meet the requirements of the Fourth Amendment, it must be shown not only that the officers had reason to suspect criminal wrongdoing, it must also be established that the officers had a reasonably articulable basis for suspecting that the defendant perpetuated the wrongdoing. *Terry*, *supra*. To the extent that the majority opinion could be read as overlooking the particularity requirement inherent in a reasonable suspicion inquiry, I disagree with it.[5]

There is no bright-line test for determining whether articulable and particularized reasonable suspicion exists under the circumstances of an individual case. However, this Court has discussed the concept in some detail. In *Shabaz*, the Court held that no reasonable suspicion existed where a

---

[5] I believe a similar mistake was made in *People v Oliver,* 464 Mich 184; 627 NW2d 297 (2001).

13

defendant was stopped because he was observed stuffing a paper bag under his clothing while leaving an apartment complex in a high crime area, and because he "took off running" when officers observing him slowed their unmarked police car to a stop. *Id*. at 60. In reaching the conclusion that reasonable suspicion was lacking under the circumstances, Justice Ryan, now judge of the Sixth Circuit Court of Appeals, stated for the Court,

> The police were not investigating a recently committed crime in the area which may have been linked to the defendant, nor was he known to the officers as a suspect in a crime. There was no visible contraband on the defendant's person; the officers could only guess at the contents of the paper bag. The defendant's flight from plain-clothes pursuers in an unmarked car was at most ambiguous and at least understandable. [*Id.* at 64-65.]

While this quotation from *Shabaz* certainly makes it clear that *Terry* searches must be carefully scrutinized, I believe that in applying *Terry, Shabaz* also implicitly raised a distinction between situations in which an officer comes upon a person unknown to him and situations in which an officer is detaining specific individuals in association with the investigation of a particular crime.

The officers in this case were in the area investigating a trespass. Further, once marijuana was found on Holder, the

14

officers were validly investigating another crime. Once Holder yelled to the defendant not to tell the officers a "f—ing thing," the officers had a basis for suspecting that the defendant had information pertaining to the crime presently being investigated. Though it is true that the defendant had done nothing to indicate that he himself was in possession of drugs, the officers had an objective reason for suspecting that the defendant might have been involved in criminal wrongdoing. Moreover, the detaining officer's testimony that he feared for his safety when taken together with the fact that the tension in the situation had escalated when marijuana was found on Holder, objectively justified the officer's belief that the defendant posed a threat of being presently armed and dangerous. Thus, I believe that this case can more closely be analogized to *Terry* than to *Ybarra*. The circumstances of this case reveal a situation where the particular individuals were being investigated in association with the suspected commission of particular violations, rather than merely a situation where the defendant happened to be in an area where other crimes were suspected of being committed. Therefore, I would conclude that this case meets the threshold established by *Terry* and justified a limited weapons patdown.

II

15

Despite my agreement with the majority that reasonable suspicion for a stop and frisk existed under the totality of the circumstances, I would affirm on the grounds that the seizure of photographs from Custer's front pocket was constitutionally impermissible. I would hold that the scope of *Terry* was exceeded when the officer seized the photographs, and would further hold that the officer lacked probable cause.

The majority concludes that the seizure without a warrant of the photographs from defendant during the patdown search was valid under the Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution. According to the majority, the seizure was justified by the "plain feel exception" to the warrant requirement, citing *Minnesota v Dickerson*, 508 US 366, 373; 113 S Ct 2130; 124 L Ed 2d 334 (1993); *People v Champion*, 452 Mich 92; 549 NW2d 849 (1996). I disagree.

In a nutshell, the plain feel doctrine provides that police may seize nonthreatening contraband detected through the sense of touch during a patdown search, as long as the search remains within the bounds of *Terry* and as long as the search would be "justified by the same practical considerations that inhere in the plain-view context." *Dickerson* at 375-376. Thus, courts considering whether an

16

item may be seized under the plain feel doctrine must consider both the *Terry* doctrine and the plain view doctrine.

In *Dickerson*, the officer patted down the defendant, and in the process examined a lump in the defendant's pocket that he believed to be cocaine. The Court held that the seizure was invalid because the incriminating character of the lump was not immediately apparent, and because the officer needed to conduct further examination in order to determine whether the lump was contraband. Though *Dickerson* itself invalidated the seizure of contraband made during a patdown search, the Court nonetheless stated that not all plain feel seizures are invalid per se. Still, the Court made clear that seizures stemming from a patdown must be carefully scrutinized:

> Under the State Supreme Court's interpretation of the record before it, it is clear that the court was correct in holding that the police officer in this case overstepped the bounds of the "strictly circumscribed" search for weapons allowed under *Terry*. Where, as here, "an officer who is executing a valid search for one item seizes a different item," this Court rightly "has been sensitive to the danger . . . that officers will enlarge a specific authorization furnished by a warrant or an exigency, into the equivalent of a warrant to rummage and seize at will. Here, the officer's continued exploration of the respondent's pocket after having concluded that it contained no weapon was unrelated to . . . the protection of the police officer and others nearby." It, therefore, amounted to the sort of evidentiary search that *Terry* expressly refused to authorize, and that we have condemned in subsequent cases. [*Id.* at 378

17

(citations omitted).]

Thus, although *Dickerson* clearly refused to impose a categorical ban on the plain feel seizure of objects "whose identity is already known" because of their immediately apparent characteristics, the Court in no way implied that any and every object that may potentially have characteristics similar to certain types of contraband would be seizable. *Id.* at 377.

*Dickerson* also stated that the "plain feel" concept has roots in the "plain view" doctrine, and the competing concerns expressed in plain view cases can be analogized to the plain feel context. Thus, it is important to understand the basic principles underlying the plain view doctrine when determining whether a particular plain feel seizure is valid. Under the plain view doctrine: (1) the seizure without a warrant of evidence in plain view is permissible as long as the police did not violate the Fourth Amendment in arriving in a place from which the evidence could be plainly viewed, (2) an item of immediately apparent incriminating character must be in plain view in order to be seizable, and (3) the police must have a lawful right of access to the item being seized. *Horton v California, supra; Coolidge v New Hampshire,* 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971); *Arizona v Hicks*, 480 US 321;

18

107 S Ct 1149; 94 L Ed 2d 347 (1987). The ability of a police officer to seize an item without a warrant pursuant to the plain view doctrine is thus circumscribed by the exigencies justifying the initiation of the search. *Horton* at 139-140. Further, "[i]f the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton* at 140.

It is in light of these principles that the *Dickerson* Court enunciated its holding. The Court explicitly recognized that while *Terry* may authorize an officer to place his hands on a criminal defendant's outer clothing, the Fourth Amendment is violated when the officer must conduct a further search in order to determine whether an object is contraband. In such instances, a seizure will be invalidated for lack of probable cause.

Thus, in plain feel seizure cases, courts must determine whether the scope of the patdown search remained within the bounds of *Terry*. If not, then the seizure made pursuant to the search would exceed the exigency justifying the search in the first instance. Additionally, courts must determine whether the object felt by an officer is immediately apparent

19

as being contraband. The determination must be supported by probable cause. Where the mass and contours of the object do not make it immediately identifiable as contraband, seizure without a warrant is not justified.

In this case, I would hold that the photographs were invalidly seized from the defendant both because the officer exceeded the scope of the *Terry* search, and because the officer lacked probable cause to remove them. First, it must be remembered that the patdown search of the defendant was purportedly initiated to protect the officer from a person suspected of being armed and dangerous. During the course of the patdown, the officer testified that he felt what he believed to be a piece of cardboard used as blotter paper for an illegal narcotic known as acid.

## A. The Scope of *Terry*

Clearly, the cardboard seized by the officer was not seized in order to advance the interest of protecting the officer. The officer did not remove the photographs on belief that they were a dangerous instrumentality, but on suspicion that they were cardboard. The officer further suspected that the item he felt was used to blot acid.

In my view, the majority's opinion in this case is the first evil escaping the Pandora's box opened in *People v*

20

*Champion.*[6]  In *Champion*, the majority extended the United States Supreme Court decision in *Dickerson* to encompass plain feel seizures of items that might contain contraband.[7] Justice Brickley dissented, explaining why seizures of items not appearing to be contraband themselves is illegal.  Though Justice Brickley's opinion did not win the day, I continue to believe that it was correctly decided.  I would adhere to his view, that when the officer patted the objects in the defendant's pocket and knew that they were not a weapon, the removal of those objects was unrelated to the protection of the officer's safety.  Thus, the exigencies supporting the patdown were unrelated to the subsequent seizure.

Regardless of the view of *Champion* to which one subscribes, it is clear that the exigencies purportedly

---

[6] See *Champion* at 143 (Brickley, C.J., dissenting)("The majority justifies its expansive reading of *Dickerson* by pointing out that it limited its holding to the facts presently before the Court. . . .  Yet, it would be naive to conclude that this state's lower courts will not read the majority opinion in a way that will allow evidence . . . against those whose Fourth Amendment rights have been violated, indeed, opening Pandora's box.").

[7] Importantly, though *Champion* supported the plain feel seizure of an item that might contain contraband, it did not allow a subsequent search merely because the item had been seized.  Rather, it required the additional justification that the search occur incident to arrest.  This cuts against the majority's rationale for searching the photographs seized from the defendant pursuant to the plain feel doctrine.

justifying the patdown search of the defendant in this case did not justify the seizure.[8]  Even the majority recognizes the patdown in this case occurred as part of a protective sweep, but that the seizure was justified pursuant to the plain feel doctrine.  Thus, we must turn to *Dickerson's* requirement that a plain feel seizure be supported by probable cause.

## B. The Absence of Probable Cause

*Dickerson* made it clear that an object is seizable only where its incriminating identity is immediately apparent

---

[8]There is a fundamental difference between the justification supporting a patdown search for weapons and the justification for seizing something that is clearly not a weapon.  In order to determine whether a search or seizure remains within the confines of an exception to the warrant requirement, one must necessarily understand the justification circumscribing the otherwise constitutionally impermissible search or seizure without a warrant. Whereas the potential presence of a weapon may justify an officer's access to the outer surfaces of a defendant's clothing during a patdown search, the fact that an officer may lawfully be in a position to search a defendant does not in and of itself justify the officer in seizing anything that he believes is contraband.  Rather, a seizure of contraband made during a patdown search requires its own constitutional justification.

In the instant case, if the officer had justification for the seizure, it was because of the plain feel doctrine, not because of the *Terry* doctrine.  Though the plain feel doctrine permits a seizure that would not have had justification but for the officer's decision to patdown the defendant, the exigencies supporting the search (fear for the safety of the officers or others) clearly would not support a seizure of blotter acid cardboard because blotter acid cardboard does not pose a threat to the officer's safety.

because of the mass and contour of the object. As an initial matter, the majority too readily assumes that a limited patdown could clearly reveal the identity of objects in the defendant's front pocket so that manipulation would not be required to support probable cause for a seizure. Obviously, the contours and mass of the objects in the defendant's pocket were not unique. This is evidenced by the fact that the officer believed the defendant was carrying cardboard, though he was actually carrying photographs. The majority glosses over the officer's factual mistake and deems it irrelevant. Though perhaps not dispositive in every case, I believe that a factual mistake about the identity of an object must be "immediately apparent," because contraband tends to reduce the likelihood that a particular seizure is supported by probable cause. And because the existence of probable cause is made less likely by the mistake, I believe such factual errors are certainly relevant to our determination whether probable cause existed.[9]

---

[9] Again, I turn to Justice Brickley's *Champion* opinion to illustrate why the seizure of noncontraband items is constitutionally problematic. He wrote:

> I would hold that *Terry* specifically forbids the type of seizure conducted in this case and thereby eliminate the incentive to expand patdowns
>
> (continued...)

Probable cause will be found to exist where the facts and circumstances, within the knowledge of the authorities and of which the authorities had reasonably trustworthy information "were sufficient in themselves to warrant a man of reasonable caution in the belief that [a crime has been committed]." *Carroll v United States*, 267 US 132, 162; 45 S Ct 280; 69 L Ed 543 (1925). A very important distinction must be drawn between the basis for an officer's ability to stop and frisk and his ability to seize an item pursuant to the plain feel doctrine. The stop and frisk must be predicated upon only *reasonable suspicion*. The plain feel doctrine allows an officer to seize immediately apparent contraband that he feels during the patdown on the ground that the officer has *probable cause* for the seizure. In other words, if an officer feels something that he only reasonably suspects to be contraband, he cannot seize it.

---

[9](...continued)
into general searches for contraband. To the extent that *Dickerson* departs from *Terry*'s strict prohibitions, it allows admission of nonweapons evidence found during a patdown if, but only if, the officers conducting the patdown have probable cause to believe that the item they feel is contraband. The item felt in this case, the pill bottle, while containing contraband, was not, in and of itself, contraband. Accordingly, it was impossible for Officer Todd to have probable cause to believe otherwise. His seizure of it, therefore, was illegal. [*Id.* at 143.]

In the present case, I am not convinced that the officer acted upon probable cause, though he may have subjectively suspected that the defendant was carrying blotter acid on cardboard. While the stop and frisk could potentially be justified on reasonable suspicion grounds, that justification would lie largely in the fact that the interest in protecting officers and innocent bystanders from the harm an armed suspect may cause outweighs a suspicious individual's interest in being free from a limited search. A seizure made pursuant to a frisk requires a higher level of justification than a frisk itself, however, because the officers have gained access to the defendant's person pursuant to a limited Fourth Amendment exception. When the seizure occurs, the balance to be considered is whether the officer's ability to seize an item to which he gained access on the basis of reasonable suspicion that an individual was armed and dangerous outweighs an individual's interest in possessing items and the individual's legitimate expectation of privacy.

Were there no concern for the officer's safety, an officer could not randomly frisk a defendant. Rather, the search must be limited to a weapons search. Here, we have a defendant who was essentially deemed guilty by association. The officers observed that Holder was intoxicated, found money

25

on Holder, and found drugs on Holder.  When they patted down the defendant, they felt no weapons and no contraband.  Yet, the majority stretches to the conclusion that the officer had probable cause to believe that the defendant was in possession of blotter acid simply because his friend had been found in possession of marijuana and because he had an object in his pocket that felt like cardboard, which could have been used to blot acid.[10]

Further, *Dickerson* would support a conclusion that the seizure here was unjustified because the officer conducted a search under the auspices of the plain feel doctrine. *Dickerson* plainly stated that where a further search is required in order to determine that an object is contraband, it is not seizable under the plain feel doctrine.[11]  Here, even if it had been cardboard that the officer felt, he would have

---

[10]  Under the majority's view, almost any object felt during a patdown could be seized.  Could a pen be mistaken as a syringe?  A marble as cocaine?  A cigarette as marijuana?  A letter as blotter paper?

[11] I, therefore, disagree with the majority that *Champion* in no way extended *Dickerson*.  Obviously, an ordinary pill bottle is not illegal to possess.  Thus, before the officer in *Champion* could determine a pill bottle could be classified as contraband, he had to determine somehow that it was in fact used for an illegal purpose.  Thus, the very type of additional search prohibited by *Dickerson* occurred in *Champion*.

had to manipulate the object in order to determine that it was in fact contraband. Cardboard itself is not contraband, and may lawfully be carried. Only a further search would reveal whether the cardboard somehow contained contraband.

In any event, the factors cited in the majority opinion do not support the conclusion that the detaining officer had probable cause to believe that the defendant was carrying drug-laced cardboard in his front pocket. According to the majority,

> In this case, while conducting the patdown search of defendant, the officer felt a two-by-three-inch object in defendant's pocket that he believed was a card of blotter acid. His belief was based on his knowledge that blotter acid was often contained on sheets of cardboard; his awareness that cards of blotter acid were capable of fitting into a pants pocket like that he felt on defendant; the antecedent discovery of marijuana and a large amount of money on Holder, the driver of the vehicle in which defendant was a passenger; Holder's shout to defendant not to tell the police anything; the fact that defendant was with Holder during the entire evening; and the officer's training and twenty-three years of experience as a police officer. Under these circumstances, the officer had probable cause to believe that the object he felt in defendant's pocket was contraband. [Slip op at 12-13.]

Interestingly, none of these factors indicates that the officer had reason to suspect that the defendant would be carrying contraband. The officer's knowledge that blotter acid is often carried on cardboard and that such pieces of

27

cardboard would fit into a pocket do not support a conclusion that this defendant, a person previously unknown to the officers, would be carrying blotter acid in his pants. Additionally, the officer pointed to nothing specific that would distinguish a piece of cardboard used to blot acid from a photograph or any other piece of paper. He had no articulable basis for concluding that whatever piece of paper the defendant was carrying was used for acid blotter.[12] Moreover, the fact that the police knew Holder was carrying marijuana does not support an implication that the defendant would be in possession of acid. In fact, at the point at which he was frisked, the defendant himself had nothing to alert the police that he was engaged in criminal activity. Under the facts and circumstances, a man of reasonable prudence and caution would have no basis for concluding that the defendant had committed the offense of possessing narcotics. Unless it is now an offense to choose one's associates poorly, I see no reasonable ground for believing

---

[12] In fact, the officer's testimony that blotter acid paper is generally paper that can be divided easily into small sections and have acid dropped on it so that it may be sucked off by a recipient tends to imply that a photograph that is thicker and slipperier than paper would not have the characteristics of normal acid blotter.

28

that the defendant could be charged with any illegality.[13]

Accordingly, I do not believe a finding of probable cause is supportable.

IV

Finally, because the majority concludes that the seizure of the photographs in the defendant's pocket was valid, it reaches the issue whether the photographs were validly examined. I will also address this argument because I believe the majority's argument is supported neither by logic nor by law.

According to the majority, "the exterior of an item that is validly seized during a patdown search may be examined without a search warrant, even if the officer subsequently

---

[13] Interestingly, the majority's probable cause rationale is barely distinguishable from its reasonable suspicion rationale. The only factor that separates the reasonable suspicion supporting a patdown search and the probable cause required for a seizure are that the officer knew cards of blotter acid could fit in a pocket. As emphasized herein, the officer had no articulable reason to believe that the defendant possessed blotter acid paper or other drugs.

Contrary to the majority's implication, I do not suggest that the same factors that would support a finding of reasonable suspicion cannot factor into the probable cause analysis. Rather, I believe it is important to recognize that the minimal factors justifying a patdown weapons search do not rise to the level of probable cause. Also the officer's additional indication that a piece of cardboard could fit in someone's front pocket, and his knowledge that some people blot acid on cardboard hardly move the degree of suspicion possessed in this case into the category of probable cause.

learns that the item is not the contraband the officer initially thought that it was before the seizure." Slip op at 20. However, the majority's argument is premised on the assumption that the police validly possessed the photographs removed from the defendant's pockets when the search occurred.

If a Fourth Amendment infringement is unsupported by a warrant or other exception to the warrant requirement, the seizure is invalid. In other words, a search or seizure without a warrant is circumscribed by the exigencies justifying it. See, e.g., *Horton, supra*. Here, the officer removed the photographs from the defendant's possession and control on belief that they were blotter acid cardboard. The purported justification was plain feel. Yet, once the officer removed the photographs from the defendant's pocket, it became clear that the object removed was not in fact cardboard. At that moment, the justification supporting the seizure, that the object was immediately identifiable as contraband, no longer existed.[14] Thus, the scope of the plain feel exception was exceeded and the police no longer had justification for

---

[14] In criticizing my approach, the majority conveniently omits this sentence. Such omission illustrates the majority's lack of appreciation of one of the most important aspects of this case-that a search or seizure without a warrant is circumscribed by the warrant exception justifying it.

infringing the defendant's right to possess private photographs.

Additionally, I cannot agree with the majority's conclusion that the search of the photographs taken from the defendant was supportable. The majority opines that the defendant's expectation of privacy in items he was carrying in his front pocket was "significantly diminished" because an officer removed them during a patdown search under the mistaken belief that they were blotter acid cardboard.[15] Certainly, a defendant has a legitimate expectation of privacy in his front pocket. I would contend that he continued to have a legitimate expectation of privacy after the photographs were removed. Under the majority view, an individual's expectation of privacy in a personal possession would evaporate at the moment an officer removes the item from the individual's control, even when the officer's belief is wrong. I cannot agree.[16]

---

[15] Ironically, the majority cites *Arizona v Hicks*, in support of its position. In *Hicks*, the United States Supreme Court held that the plain view doctrine would not support a seizure where the officers exceeded the scope of the exigency allowing them to be in a place to see what was suspected to be contraband, and also where the police had to move an item in order to determine whether it was in fact contraband.

[16] The majority takes pains to try to explain why rights
**(continued...)**

31

Though the officer's correctness in his belief that an item is probably contraband might not ultimately invalidate a seizure,[17] a mistake on the officer's part would most certainly undermine the validity of a subsequent search. Subsequent searches of items seized by police under a Fourth Amendment exception allowing a seizure without a warrant, must

---

[16](...continued)
are only " diminished" under its approach. While the majority admittedly uses the phrase "significantly diminished" throughout its opinion, I am not persuaded that the label accurately fits the approach. When would a legitimate expectation of privacy preclude a further search under the majority's rationale?

The majority seems to argue that the result might be different were the officer required to open a container and look inside. Yet, how can this be true considering that the majority places primary reliance on *Champion*, a case in which the officer did just that? Further, the law does not support a conclusion that an officer somehow has justification to manipulate an object and search parts of its exterior that are not in the officer's view. Our Supreme Court has said that plain view seizures are not justified where the officer moves an object even minimally in order to determine whether the object is illegally possessed. *Hicks, supra*. Similarly, an object that must be manipulated in order to determine whether it is contraband is not subject to seizure under the plain feel doctrine. *Dickerson, supra*. The same rationale applies in the context of the present case. I see no meaningful or outcome-determinative distinction between a situation where an officer has to manipulate an object's exterior in order to determine whether the object contains contraband and a situation in which the officer must open the object and look inside to determine whether it contains contraband. In either situation, the officer is conducting a search of an object in order to convert his suspicion that an object contains contraband into confirmation that it does.

[17] It would, however, be relevant to a determination whether probable cause existed.

necessarily be subjected to a determination whether the individual defendant retains a privacy interest though his possessory interest has been infringed.  Surely, society is less likely to recognize an expectation of privacy in illegal materials as being legitimate than in legal materials.  The legitimacy concerns associated with contraband simply do not attach to noncontraband items.  Thus, if an officer mistakenly seizes a noncontraband item and then searches that item, despite the fact that the item seized is not the contraband he suspected it to be, the officer is necessarily infringing on a privacy interest.  *Dickerson* itself recognized that contraband may be seized during a plain feel or plain view search because the police should not be forced to ignore an apparent illegality.  Where the item "felt" is not illegal, the same concerns are not present and the exigency is no longer present.

Moreover, the majority effectively creates an exception to the warrant requirement that permits a search incident to seizure.  No such exception exists.  Even if I were to agree with the majority that there was a valid basis for seizing the defendant's photographs, I would not support a rule that eliminates an individual's expectation of privacy in an item lawfully possessed, but nonetheless seized.

The majority protests that it cannot have created a search incident to seizure exception because it found no search.  However, the basis for its conclusion that no search occurred is that a defendant has a "significantly diminished" legitimate expectation of privacy in something seized.  The majority approach adds weight to my point that the majority's "significantly diminished expectation of privacy" conclusion is distinguishable from a "no legitimate expectation  of privacy" conclusion in words only.  The majority itself admits that "in order for there to be a 'search,' one must have a reasonable expectation of privacy in the object being "searched.'"  Slip op at 27.   To conclude that no search occurred, then, one must conclude that an individual has no reasonable expectation of privacy in the place to be searched.  If an individual has a diminished expectation of privacy, as opposed to no expectation of privacy, then necessarily he must have some expectation of privacy in the place to be searched.  If the majority is unwilling to conclude that the defendant had no expectation of privacy, then it cannot also satisfy the test it enunciates as a basis for concluding that no search occurred.

Further, the reason that no "search" occurred in the majority's view, is that the defendant's expectation of

privacy had been significantly diminished by virtue of the prior seizure.  Under this view, the police's subsequent search was justified by its own prior conduct.  Were it not for the seizure, there could have been no subsequent examination because the defendant would have had a reasonable expectation of privacy in his pants pockets.  Thus, the majority effectively allows the police to search something seized, and then allows the police to conduct an examination of an object they have seized, by concluding that such an examination would not be a search.  Such logic is contrary to search jurisprudence, which focuses on whether a legitimate expectation of privacy has been relinquished.

Also, I find it significant that the majority relies on *Champion*, *supra*, to support its conclusion that the officer could seize an item from the defendant, but then ignores *Champion*'s recognition that

> [t]he search of a container preceding a formal arrest can qualify as a search incident to arrest if probable cause for the arrest existed before the container was searched. . . .  However, a search of a container cannot be justified as being incident to an arrest if probable cause for the contemporaneous arrest was provided by the fruits of the search. [*Id*. at 116.]

Perhaps the majority would conclude that because no container was opened in this case, the search of the photographs in an

attempt to develop probable cause to arrest was permissible. However, as explained above, such a distinction cannot validly be drawn. Here, the defendant was not arrested until after the photographs were removed from his pocket and examined. The probable cause for the defendant's arrest grew largely from the search of the photographs.[18]

Despite the majority's conclusion to the contrary, not every item seized by police officers is automatically subject to search without a warrant. In fact, the United States

---

[18] There was some discussion at trial about when the defendant was actually placed under arrest. The trial transcript indicates that the defendant was not formally arrested at the time he was transported to the police station for questioning after the police examined the photos seized from his front pocket; however, the detaining officer also testified that the defendant was not free to leave after the photographs were seized. What is clear, though, is that this "arrest" of the defendant is not the same arrest upon which the charges of delivery and manufacture, maintaining a drug house, and conspiring to deliver or manufacture were predicated. Those charges were brought on the basis of evidence seized during a search of the defendant's home that occurred after officers decided to investigate the defendant because of what they had seen when examining the photographs.

Following the chain of events backward reveals the number of steps that were taken in order to develop probable cause for the defendant's ultimate arrest for the drug offenses that form the basis of the instant appeal: the arrest grew from the seizure of drugs, which grew from the search of the defendant's house, which grew from the search of the photographs, which grew from the seizure of the photographs, which grew from the patdown search of the defendant, which grew from reasonable suspicion that he was armed, which was inferred from the conduct of Holder.

36

Supreme Court has explicitly held otherwise. In *United States v Jacobsen*, for example, the United States Supreme Court wrote,

> Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such packages are presumptively unreasonable. Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package. [*Id.* at 114, citing *United States v Place*, 462 US 696, 700-701; 103 S Ct 2637; 77 L Ed 2d 110 (1983); *United States v Ross*, 456 US 798, 809-812; 102 S Ct 2157; 72 L Ed 2d 572 (1982); *Robbins v California*, 453 US 420, 426; 101 S Ct 2841; 69 L Ed 2d 744 (1981) (plurality opinion); *Arkansas v Sanders*, 442 US 753, 762; 99 S Ct 2586; 61 L Ed 2d 235 (1979); *United States v Chadwick*, 433 US 1, 13, n 8; 97 S Ct 2476; 53 L Ed 2d 538 (1977); *United States v Van Leeuwen*, 397 US 249; 90 S Ct 1029; 25 L Ed 2d 282 (1970).]

Using *Jacobsen* as an analogy, the majority's approach would yield the result that a person's private package could be opened and searched because the individual expectation of privacy in the item was lost at the time it was seized. The United States Supreme Court reached a contrary conclusion, and so do I.

## CONCLUSION

In this case, the officer impermissibly infringed upon both the defendant's possessory interest and his privacy

interest.  The photographs were impermissibly seized from the defendant in the first instance, impermissibly retained, and impermissibly searched.  Therefore, I would affirm the decisions below and hold that the fruit growing from the seizure of the photographs must be suppressed.

KELLY, J., concurred with CAVANAGH, J.